The next case today is the City of Quincy v. MA Dept. of Environmental Protection, Appeal No. 21-1131. Attorney Hayden, please introduce yourself for the record and proceed with your argument. Thank you. May it please the Court, Michael Hayden on behalf of all petitioners. Your Honor, may I please reserve two minutes for rebuttal? You may, and good morning. Good morning. Thank you, Your Honor. I'd like to spend a brief moment on certain background information that exemplifies the petitioner's concerns in this case. Though unrelated to this pending matter, yesterday, September 13th, marked the three-year anniversary of the natural gas explosions in the Merrimack Valley, a concern that remains in the forefront of the petitioner's On October 1st of 2020, the Pipeline and Hazardous Materials Safety Administration issued a corrective action order requiring a root cause failure analysis of two unplanned emergency releases of natural gas at this Weymouth Compressor Station facility. In their briefs, both the applicant, which is Algonquin Gas Transmission, and the department cite the Metropolitan Area Planning Council, the MAPC, health impact assessment was completed in the review of this Weymouth Compressor Station proposal. However, after- Mr. Hayden, can I just interrupt you one second? Jim, is this good enough? Because he's fading in and out. Is this sufficient for purposes of transmission? Okay. All right, you may proceed. Thank you very much, Your Honor. On February 6, 2019, the MAPC issued a statement which read, since the publication of the health impact assessment, we've been asked if we support this natural gas compressor facility. The answer is that we do not. We base that opposition on the climate implications stated above, as well as the environmental implications. In yet another related action, before the Department of Public Utilities, on May 8, 2020, the Attorney General's Office submitted a brief in which they took the position that the department should find the agreement is not in the public interest and deny the company's petition for approval, stating that the agreement would pass through the costs of the Weymouth Compressor Station to the company's rate payers, and adding insult to injury, the Weymouth customers for the agreement. Now, Your Honor's focusing... Your client's concerned about a particular regulatory ruling by an agency that has been appealed to us. Yes, Your Honor. Let me, if I can turn to... That ruling, I'd like to try to make sure I'm understanding some of the math behind it and what the materiality is of the many different issues you've raised. If we were to disagree with you that the annual operating costs of the EMD should be set aside and not included in the calculation because they're passed on to customers, if we disagree with you on that, then, am I correct, as I do the math, you would lose even if you won on every other issue? Your Honor, I am not prepared to concede that point, although I agree that that would make it a very close call. But could you explain how you could possibly win if you lose that issue? Yes, Your Honor, and thank you for the question. The whole cost effectiveness calculation has demonstrated the jockeying that both the department and the applicant have done to do two things. We have the numerator side of the equation and the denominator side of the equation. You're focusing at the moment on the numerator side, which includes not only the capital costs of construction for an electric motor drive, but also the operating costs, and specifically, Your Honor, you're focusing on the cost of electricity. Now, what's interesting, Your Honor, in presenting their arguments is on the denominator side, the department and the applicant have argued that you have to ignore Dr. Sahu's recommended 120 parts per million VD of NOx because the cold temperatures or the startup emissions don't occur with enough frequency to justify that as an accurate snapshot of ongoing operation. Essentially, there aren't enough cold days in Weyman in order to use the 120 parts per million VD. However, on the numerator side of the equation, Your Honor, they've done the complete opposite because if you refer to Algonquin's brief at page 45, they make the statement that the NSR manual provides that same realistic upper boundary assumptions must be applied consistently throughout a cost effective analysis. That's it, Joint Appendix 1992. They refer to the apples to apples comparison in this context, and they ask the court to consider the horsepower required to operate the natural gas-fired combustion turbine, not the maximum horsepower generated by an electric motor drive. And so while they ask this court to ignore an increased denominator figure because there aren't enough cold days in Weymouth, they also ask this court to ignore the manufacturer's specifications that apply to the electric motor drive, which include a lower horsepower output. And that solar specification, Your Honor, is at Joint Appendix 3309. Taking the solar specification for horsepower output, that reduces the cost of electricity required to operate the compressor station. And that's why I don't believe it's as simple as if our argument that you should exclude the electricity costs altogether, which make no mistake, Your Honor, that is the petitioner's argument, that with the testimony from Mr. Harvey, that Algonquin can recover the entire cost of electricity from its customers through what's called a reservation charge in its contract. That expense will not be borne by Algonquin on an annual basis in order to operate the electric motor drive, and therefore should not form the basis in a cost-effectiveness calculation to determine that it's too expensive. But even if we were to agree with you on your point regarding the numerator, if we disagreed on your latter point having to do with ignoring the cost because it's passed on to the customers, we'd still end up with a number, wouldn't we, that's in excess of cost-effectiveness range. If we were to lose on all of the other arguments, Your Honor, perhaps. But even if you won on all the other arguments, wouldn't you still be above the range? No, Your Honor. So the other arguments include using the Federal Reserve's prime bank rate interest rate, recalculating the cost-effectiveness threshold from its current 1990 established range of $11,000 to $13,000 per ton of NOx to what Dr. Sahu recommends, $20,350 to $24,050 per ton of NOx. Counselor, let me ask you about that cost-effectiveness range point, which I agree is obviously quite important. I mean, as I understand it, the department takes the position, I mean, everybody seems to agree that that range is outdated. And going forward for future projects, the department should establish a different range. But on what basis, in the absence of going through the policy process, it seems to be required to establish a new range. On what basis could the department do it in the context of this specific case? It seems to me the law is very much against you on that issue. And you're surely not suggesting that if we were to remand, that we could somehow order the department to engage in a rulemaking process that would establish new ranges. So I guess it's a two-part question. On what basis could they do it in the context, that is, revise those ranges in the context of this process? If they can't do that, on what basis could we order them to do it if we were to remand? Four minutes. Thank you very much for the question, Your Honor. The basis is that utilizing a 1990 cost effectiveness threshold, as well as an interest rate established in the new source review manual in 1990, is inherently unreliable and inapplicable to review of a project under consideration in the year, at that point, 2020, and going forward. You're conflating two very different issues. I want you to focus specifically on what I understand is a range that was a result of a rulemaking process. On what basis could the department, in the context of this case, disregard that rule? And on what basis could we order them in any future proceeding to engage in a rulemaking process that would revise those ranges? Well, to that specific question, Your Honor, I would answer that not only in the instant recommended final decision on remand, but in the earlier recommended final decision issued by the Office of Appeal and Dispute Resolution. The recommendation was made by the presiding officer, Jane Rothschild, to update the dollar amounts used for the cost effectiveness determinations in the back guidance to reflect a cost range that accounts for inflation, because the range was last revised in 1990. Didn't she feel constrained about updating it in the middle of this application? She acknowledged that they were outdated, but she felt constrained to still use what was applicable at the beginning of this process. Agreed, Your Honor, and so the point I'd like to make is that the department has had now not one, but two warnings. The presiding officer issued her recommendation to update that dollar amount used for the cost effectiveness threshold in June of 2019, and no action was taken before the case was brought back on remand for the backed evaluation. Now a second time, the presiding officer, and this is at addendum 65, page 65 and 66, has recommended those values be updated. The petitioners argue it was an abuse of discretion for the department not to revisit that cost effectiveness range and commence an updating of that range between the June 2019 recommended final decision, when it was first put on notice that the range was outdated, and now this remand procedure where the range remains outdated and whether to update the range. Why does it follow they have wide discretion as to where they set the range, right? Well, certainly is the agency responsible for enforcing the range. They have a good deal of discretion, yes, Your Honor. Okay, so what says that they're automatically required to adjust the range over time? I would argue in the absence of a recommendation by the presiding officer, there would be nothing to trigger that review. But now the presiding officers can make all sorts of recommendations. They don't get to set the rules, they're supposed to apply the rules. I think that's understood. And in applying the rules, Your Honor, the presiding officer not once but twice stated that the range was outdated and in need of revisitation and reconsideration. Sure, the presiding officer could have made a list of 20 DEP rules that he thought were outdated or should be updated or wrong. How does that impose an obligation on the agency to then have to go back and revisit all those 20 rules? Counsel, that's time. You may answer, Your Honor. Having received the first recommendation in June of 2019, Your Honor, it was incumbent on the department to acknowledge the presiding officer's recommendation. And if the department decided to reject it and make no effort to reconsider or bring the cost-effectiveness range into modern times, then say so. And then we'd be left with the wide discretion of the department to take no action in response to the presiding officer's recommendation. But they failed to do even that. They simply have taken no discussion on the matter whatsoever, which is why the presiding officer re-emphasized her position that this cost-effectiveness range needs to be updated in her most recent recommended final decision after remand. Counsel, I'd like to ask you a question. I guess this has to do with the denominator, the baseline emission issue. There is, as the department explains why it rejected Dr. Sahu's sort of worst-case scenario there, that made some sense to me. It's my understanding that if you're going to use a worst-case scenario, it's got to be in a situation where there is so much uncertainty about what the emissions, what the emission rates might be, that somewhat protectively, in the face of that uncertainty, you would then take the worst-case scenario. I don't think we have that kind of situation here. And here, the relevant manual seems to suggest that you should look at a range of temperatures, not take the worst-case scenario. And that seems to me to be what the department did. And it seems to me to be supported by the entries in the relevant manual. So, I'm not sure I get your argument as to why the department was not entitled to approach a baseline emissions rate as it did. Thank you very much for the question, Your Honor. And the response is that this court was correct in its June 2020 order that the baseline is not the nine parts per million VD that is generated with the solo NOx technology active. Because absent the solo NOx, you have a much higher emissions volume. And even the standardized emissions volume increases under certain situations, one of which is low temperature, which I mentioned a moment ago, but others include low load. So, when the compressor is not operating at a full load, another is startup and shutdown events, which happened 40 times scheduled over the course of a calendar year. And so, the point that the petitioners are arguing that Dr. Saathu supported with his testimony is there are enough of these irregular events, whether they're low load, low temperature, startup, or shutdown, where increased emissions above the 25 parts per million VD are emitted from that compressor station into the local environment. And the premise behind the uppermost range that is called upon in the back review is not to try to determine what the most likely emissions are on a given day or the average emissions. It's very literally the uppermost range of unregulated emissions that are called for in this denominator equation. And Dr. Saathu used a very clear and intelligible way to reach that by looking at what the manufacturer specifications report for emissions under low temperature, low load, and startup and shutdown conditions. Thank you. All right. Thank you, Counselor. Thank you, Your Honor. Thank you, Mr. Hayden. Please mute your audio and video at this time. Attorney Schofield, please unmute your audio and video and introduce yourself for the record and proceed with your argument. Good morning, Your Honor. Seth Schofield on behalf of the responding Massachusetts Department of Environmental Protection. Good morning, Mr. Schofield. Thank you, Your Honor. And may it please the court. I'd like to begin with a question that was asked earlier in terms of the scope of the issues before the court and how the different ways in which the court can resolve this case. In particular, Your Honors, if the court affirms on the electricity cost recovery issue, this case is over because the petitioners cannot prevail on their Step 4-backed arguments, even if they were to win on all of their other arguments. So today, I'll focus mainly on the Step 4 electricity cost recovery issue, and then I'll touch on one other issue, the baseline emissions rate, both of which convincingly show that the department was correct in its final decision. First, Your Honors, the department reasonably included the cost of electricity to power an electric motor as an operating cost in its cost-effectiveness calculation. Here, both the NSR EPA's NSR workshop manual and its cost control manual make clear that electricity costs are, quote, operating costs. And I'll give Your Honors one side to the record. I could give Your Honors some additional ones if that would be helpful. Counsel, what was the point of Mr. Harvey's testimony that those costs could be offset by charging customers? What was the point of that? I don't think there was any point to that, Your Honor. I think it was largely a red herring, and I'll explain that to you in one way that's based in the record, which is the department and the petitioner's expert, Dr. Sahu, both included the cost of natural gas to power the natural gas unit as an operating cost in their cost calculation. And it is undisputed that those are costs that Algonquin recovers from its customers through the rate set by FERC. For whatever reason, and I don't understand it myself, Your Honor, the petitioners want to take the diametrically opposite position that when it comes to, that's for some reason, the department should treat electricity costs different than it treats natural gas costs. And again, the petitioner's own expert included the cost of natural gas in his cost effectiveness calculation. Moreover, Your Honor, petitioner's expert, Dr. Sahu, also included the cost of electricity to run an electric motor in his cost effectiveness calculation. So there is absolutely no basis. The petitioner's expert, the petitioners have conceded the point. And again, Your Honor, if the court affirms on that point, the case is over. I just say, and kind of continuing on that theme, Your Honor, that it's the petitioners can't have it both ways. And even if they could, if there was some support for that, there's no, they point to no legal authority, no record-based evidence that indicates that the department may exclude from its operating cost calculation the cost that a company can recover from its customers. Indeed, such a rule would make absolutely no sense because a successful business recovers all of its costs, plus some to make a profit to stay in business. The department's finding on this point was both eminently reasonable and supported by substantial evidence. And this court should affirm on this point. And again, if it does so, it must also affirm the department's step for finding. What do you say to Mr. Hayden? Mr. Hayden responded to my question by trying to explain a theory whereby we could rule against the petitioner on the electric cost and yet still find for them overall. And he said, because we would turn our attention to the numerator and I'm not quite sure I understood his explanation. Do you have a With all due respect, following that, my understanding, I'm not a mathematician, but I don't believe the math works in the petitioner's favor on that issue. Even if you were to make a minor adjustment to the electricity costs that would be incurred to run an electric motor based on the petitioner's argument that Algonquin, I guess, five minutes, oversized the electric motor such that it would use more electricity than needed. Something that's puted by the record and the department's final decision. And even if you were to bring them on that issue, the math still does not work in their favor. It's dramatic. The cost effectiveness calculation, even, and I should be wanting to make this point clear as it's in our brief, but the department's cost effectiveness calculation excluded from the calculation, the more than $12 million in capital infrastructure costs needed to run the electric motor at the site. Even excluding the $12 million in capital costs, the department still calculated the average cost effectiveness of an electric motor as $192,505 per ton of MOX or NOx looped. And that's at our addendum page 40. In other words, the cost of an electric motor from this site exceeds by a dramatic margin the department's cost effectiveness range. Council, suppose we were to disagree with you on the relevant interest rate on the cost of installing all the infrastructure and related item. I mean, it's the 3% versus 10%. I am struggling to figure out what the rate of return on equity has to do with the issue in that part of the numerator. I mean, maybe I'm just too limited in my understanding. I understand borrowing costs, which you have to pay when you borrow money. That seems to me to be the relevant consideration, and that's in the 3% range. How you get to 10% because you then have to factor in return on equity, I just don't understand that. And I think the department is just flat out wrong on that issue. I guess I'd like you to try to defend it. Thank you for the opportunity, Your Honor. And I'll try to answer that question in several ways, but I will also defer part of my answer to Algonquin's Council, Mr. Marlowe, who's much more familiar with the borrowing and financing scheme for the project. But first, Your Honor, I would say, and I apologize, this is not directly responsive to your question, but it is responsive to a theme that we're hearing here today, which is even if you agreed with the petitioners on that issue, it wouldn't change the result in this case because it has such a small impact, and it only affects the capital costs issue. That's where the interest rate gets plugged in. And again, the department excluded the capital costs from its calculation, so the issue is largely irrelevant. And then again, turning more directly, Your Honor, I would suggest that the 10% is reasonable based on guidance in this court's prior decision. In this court's prior decision, the court said that 10% was a reasonable interest rate to use, and that was the interest rate that it used in its calculation. And that is the interest rate that is also set forth in the form that the department provides to applicants to fill out for the VACT analysis. It's also included in the EPA's materials, including, I believe, the NSR workshop material. And then the cost control manual, Your Honor, which is another EPA document that's been adopted by the department for purposes of the VACT analysis, directs the department to use a firm-specific rate when a firm-specific rate is available. In my understanding, and again, Mr. Martin can get much deeper into the weeds on the particulars of that number and the issues, but my understanding is that is the firm-specific rate in this case, and that is why the department relied on it in its decision. Which again, it's relied on it only such that it's at that point. But again, it's not really relevant today because the court excluded the capital costs from the calculation. The interest rate is irrelevant. Final question. Would it be an unfair inference, counsel, given your focus on the step four analysis, that you're not inclined to try to defend the independent step one justification for the VACT determination? Would that be an unfair inference? That would be an unfair inference, Your Honor. I started there today for two reasons. One, because that's where the court started, but also because, somewhat respectfully to the court's prior opinion, it was clear that the court did a lot of work on its own. We didn't have oral argument in that case to work through some very, at least from my perspective, very complicated issues in trying to understand how the calculation works and to sort that out in the opinion. So, I also thought it would make sense to start there today because the court had spent so much time on that issue before. But no, Your Honor, that's not the correct inference. We believe that the court can affirm on either basis and under the redefining the source doctrine, we think it's quite clear here without going too far. Counsel, that's time. Well, let me ask you about, very quickly, about step one. Why is it redefining the source when all we're talking about is what type of process should be used to drive the compressor, whether it should be driven by natural gas or electricity? They're both available. It's not like we're suggesting that an entirely new facility has to be created to use a different kind of energy source. It just, it seems to me much too facile to say, well, just because the petitioners are arguing that an electrical driven compressor would be the BACT, that that redesigns the source. Frankly, that makes no sense to me. Yeah, Your Honor, thank you for that question. And there's a couple included within it. And it probably won't surprise you to hear that the department and I today will disagree with your position. But let me explain why. The purpose of the redefining the source doctrine is, and this is in our brief, and it comes from, I believe, either the Seventh Circuit's decision in Sierra Club or the Ninth Circuit decision. But the job of the department in instances like this is described as the crucial question. Is to draw a line between where the control technology, because really the focus of the BACT analysis is on control technology. How do you control, better control emissions from the source proposed by the applicant? So the job of the department is to draw a line between where the control technology ends and a redesign of the facility begins. And here, I think it's quite clear that we're talking about, not only are we talking about a redesigned facility, we're talking about a completely different facility. Yes, they do serve the same purpose, but a natural gas powered unit is very different from an electricity powered unit. They have very different technical specifications. I'm not an engineer, but just from my kind of lay person's understanding of it, they are different motors. They have different- Yes, they're different. All those differences in the cost implications, the energy implications, the environmental implications, those all get factored into the step four analysis. I don't know. It seems to me that that's where the implications of the different control technology, and that's what we're talking about here, a different emission control technology, not an entirely different facility. I mean, that's where all that stuff plays out, not at step one. Well, you're right, respectfully, it is a different facility. It has different infrastructure needs. Here, the power isn't readily available, which is the test. Algonquin, the record indicates that Algonquin would have to construct or engage in approximately $12 million in infrastructure upgrades in order to facilitate the operation of an electric motor at this site, but they are different units. The reason, at least my understanding of it, the reason for the redefining the source principle is that, as your honors are quite familiar with at this point, the backed analysis, and especially as you move through each step and get to step four where you're doing pretty complicated calculations, it's very resource intensive. So, the redefining the source doctrine is meant in part to focus the department's attention on those pollution control options that are viable for the site and make the most sense, and not to engage in an elaborate calculation for every possible type of infrastructure that could be built that might be able to reduce emissions. I think a good example here is in the NSR workshop manual, and the court may have cited this in its prior opinion, but this is akin, I would suggest, to converting to a situation where an applicant proposes to construct a coal-fired electricity generating power plant, and the department ordering them to consider constructing a natural gas-powered unit. Both of those, the coal-fired plant, the natural gas-powered plant, they both serve the same purpose, right? They both take a fuel, they convert it into energy and electricity that's used by consumers. And the same could be said for this case, where natural gas unit and electric motor, they both have, you know, create power to compress. Counsel, it seems to me the better example is where you, and this comes out, I think, one of the cases where you have a proposal to construct a coal-fired power plant specifically to use readily available low-sulfur coal. And so, the ready availability of that low-sulfur coal is central to the proposal. And if you suggested a different fuel source, then you are redesigning, then you are redesigning it. But we don't have this here. I mean, you have, it has cost implications, but electricity is available here. Well, I agree, Your Honor, that that is an apt example. But I would disagree with Your Honor that electricity is readily available. It's not readily available at this time. Sure. All right. Thank you. Appreciate it. Thank you. Thank you, Mr. Schoenfeld. Okay. Thank you. If there are no further questions, we would ask the Court to affirm the Department's decision. Thank you. Thank you. Good morning, Your Honor. Jeremy Marwell for Intervenor Algonquin Gas Transmission. If I could just make a few points and start where Judge Cayada did with what you do and don't need to decide here. If you disagree with the petitioners about the cost of electricity, they cannot win this case. And you don't need to read any of the other challenges that they have raised to the cost-effectiveness calculation. Just to make sure the math is clear, I would refer you to pages 38 to 39 of our brief, footnotes 22 and 23, and I'm happy to walk you through that. But just to explain why other issues they have raised are academic, they don't change the outcome. You have the calculation that Mr. Schoenfeld referred to at page 40 of the agenda with the $192,505 per ton of NOx removed. That assumes zero capital costs, so it disregards all of the transmission infrastructure. And because it excludes capital costs, it makes the interest rate irrelevant. The interest rate only factors in when you are trying to take the total amount of capital costs and annualize them. So reduce the aggregate amount to a handful amount. In that $192,000, that includes the cost of electricity, and it includes the department's 25 parts per million baseline. The reason I say that the electricity costs are the entire ballgame, and this is the pages 38 to 39 of our brief, is that even if you assume the commissioners are right about the 120 parts per million baseline, that's the baseline based on 365 degrees below zero Fahrenheit, the total effectiveness is $40,104 per ton of NOx. And that is above even the petitioner's adjusted threshold. So the petitioners have argued to increase the threshold from $11,000 to $13,000. Their preferred range is 20 to 24. So $40,000 is greater than $24,000, and all you have to decide, therefore, is the cost of electricity, and you can deny the petitioner's review on that basis. On the cost of electricity issue, petitioners mentioned a disagreement, a technical disagreement about the horsepower that the department used in figuring out how much the department did was reasonable, but the headline for you is that that issue also doesn't matter. If you go to assume that petitioners are correct, and you can see the math in footnote 32 of our group, the cost effectiveness is still above the threshold, and so you would not need to decide that issue either if you wanted to rule on the narrowest possible ground. I'm happy to talk about the interest rate, given that there was interest in that. The crux of the issue is that Algonquin actually financed the project with a combination of debt and equity. So it borrowed some money, but it also used equity, essentially, like issuing, you know, shares, equity, and debt. Petitioner's position is essentially that we should have only been allowed to borrow. The interest rate that is shown that we used is about 3.54%. It's pretty close to what the petitioner is arguing for. The difference is that you need a higher return to extract equity capital, and at the risk of talking about economics 101, that is in part because debt holders are protected under the bankruptcy laws, but equity holders are not. And so the EPA cost control manual recognizes that in the real world, project developers finance these projects with a combination of debt and equity, and the evidence we can bring in about the actual cost of this project was a weighted average of how much debt and how much equity, and that's why the number is higher than 3.54, or the 3%. I am happy to talk about redefining the source doctrine, but I agree with the department that we would not need to reach that. A couple of quick points. First, the department made five specific findings here about why this project would redefine the source. The fact that there was co-located natural gas, the fact that the co-location improved the reliability, because even when the electric turbine was out, the gas turbine could continue to compress gas to serve the purpose of transporting gas for its customers, the structure of the contracts that Algonquin entered into, major changes that putting the EMD and the electric motor in would require to the facility designs, and the infrastructure needed to bring the transmission line to the site. Counsel, that's time. Thank you, Your Honor. I would ask if there are no further questions, that you deny the petition. Thank you. Thank you, Attorney Marwell. Please mute your audio and video at this time. Attorney Hayden, please unmute your audio and video, and please proceed with your two minutes of rebuttal. Thank you, Your Honors. Justice Lopez, you asked one question, what was the point of Harvey's statement on the ability to recover the cost of electricity? And I'd like to touch on that for a moment, because the In Re La Paloma Energy Center LLC case, which was cited by both the applicant and the petitioners, it's an EPA environmental appeals court case, and included in its decision, it stands for the proposition that there cannot be a bright line automatic backed off ramp, whereby an applicant seeks to avoid considering a different control technology by ignoring its possibility at the outset. And in this instance, had the applicant included contract language with its customers to recover the cost of electricity and presented that to the department, we would have had a completely different review process, because the department would have had in its consideration, the fact that the applicant was not going to pay a dime for these recovered costs of electricity to operate the electric motor drive. And it's power the natural gas fire combustion turbine was a drastically lower number of $2.106 million. So the seven plus million dollar figure that we see for the cost of electricity, when the calculation is made, subtracts out the $2.106 million cost of natural gas. And I don't understand what you're saying. The cost, the cost recovery is inherent in all of these ventures that would apply to the use of the gas turbine as well. I mean, it has costs, and there will be an attempt to recover those costs through contractual arrangements with customers. And they say that you acknowledge that. So I don't, there seems to be something off about insisting that this potential for cost recovery should factor into that numerator calculation so that the electrical cost just disappears. That's going to be true. That's always going to be true. There's always going to be cost recovery. So why should this proposal be treated differently on that score? I just don't understand that. Thank you. If I may answer. Yes, please do. Your Honor, because it's the last number standing. So the only number that is preventing the EMD from being deemed cost effective by the department is the fact that the applicant is telling the department that it will cost seven plus million dollars per year to power the EMD with electricity. And the reality of the applicant's contractual relationships with its customers is that it is able to recover that entire cost as a reservation charge. So as a matter of law, it cannot be deemed to be cost prohibitive for this applicant to use the EMD. And in this situation, it's not about determining what the applicant's bottom line is. It's a determination of whether one control technology is more cost effective than another. And here, because of the reservation charge, the EMD is inherently more cost effective to the applicant than the natural gas fired combustion turbine would be. Counselor, I do have one more question. I want to be sure I understand what you're asking us to do. I get the sense that in an ideal world, you would like us to actually say that the best available control technology here is the EMD, and that is what has to be done. Failing that, you would want us to tell the department to do another analysis to see if it meets using the natural gas compressor to see if it meets the cost effectiveness threshold. I just want to be clear on what you're asking us to do. Thank you very much, Your Honor. Yes, in an ideal world, Your Honor, the petitioners respectfully request that this honorable court hold as a matter of law on this record that EMD is back. Short of that, Your Honor, the petitioners respectfully request that this honorable court remand the proceedings back to the department for a recalculation of the cost effectiveness of EMD versus a natural gas fired combustion turbine so that a correct interest rate can be incorporated, a correct baseline rate of emissions can be incorporated, a correct electricity cost using the appropriate horsepower can be incorporated, and we haven't touched upon this to the extent that capital construction costs are considered so that actual information related to this project and not other projects, which is the information submitted by the applicant, be considered. And if I could end on this last point, Your Honor, if this remand is granted by the court, it would invoke Chapter 8, Acts 2001, the environmental justice law that is now in effect in Massachusetts would require the department to complete an environmental impact report because this project is located within one mile of environmental justice populations and is likely to cause damage to the environment. I understand the argument that law cannot be retroactively applied, but if this court remands the proceeding for recalculation, the environmental justice law that is now on the books in the commonwealth must be followed. And finally, would you say that we also would have to direct that the department establish new cost effectiveness ranges as part of its recalculation of DACT? Is that what you'd be asking us to do? In an ideal world, yes, the petitioners would respectfully request that this honorable court order the department to recalculate its cost effectiveness ranges. However, short of that, Your Honor, we would ask this honorable court to direct the department to acknowledge the presiding officer's twice made recommendation to revisit the cost effectiveness range. And if the department chooses a third time to ignore that recommendation, it does so at its peril because we would reserve our rights to outdated, unreliable, and does not serve the citizens of the commonwealth of Massachusetts by following 1990-laden information. Thank you, Counselor. Thank you very much, Your Honor. Thank you, Judge. That concludes our argument in this case. Attorney Hayden, Marwell, and Schofield, you should disconnect from the hearing at this time.